## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| DOLORES CARDOSO, on behalf of herself and all others similarly situated,<br><br>     Plaintiff,<br><br>v.<br><br>CAVENDISH FARMS, INC.; CAVENDISH FARMS LTD.; J.R. SIMPLOT COMPANY; LAMB WESTON HOLDINGS, INC.; LAMB WESTON, INC.; LAMB WESTON BSW, LLC; LAMB WESTON SALES, INC.; LAMB WESTON/MIDWEST, INC.; MCCAIN FOODS LTD; MCCAIN FOODS USA, INC.; NATIONAL POTATO PROMOTION BOARD, D/B/A POTATOES USA; CIRCANA, LLC,<br><br>     Defendants. | Case No.: 1:25-cv-00304<br><br><br>**CLASS ACTION COMPLAINT**<br><br>**DEMAND FOR JURY TRIAL** |

Plaintiff Dolores Cardoso ("Plaintiff"), on behalf of herself and all others similarly situated, brings this class action to recover damages and obtain injunctive relief against Defendants Cavendish Farms, Inc. and Cavendish Farms, Ltd. (collectively, "Cavendish"), J.R. Simplot Company ("Simplot"), Lamb Weston Holdings, Inc., Lamb Weston, Inc.; Lamb Weston BSW, LLC; Lamb Weston/Midwest, Inc.; Lamb Weston Sales, Inc. (collectively, "Lamb Weston"); McCain Foods, Ltd. and McCain Foods USA, Inc. (collectively, "McCain") (together with Cavendish, Simplot and Lamb Weston, the "Processor Defendants"); National Potato Promotion Board, d/b/a Potatoes USA ("NPPB"); and Circana, LLC ("Circana") (together, "Defendants") for violations of the antitrust laws of the United States as well as the antitrust, consumer protection, and common law of the states set forth herein in connection with Defendants' conspiracy to fix prices of Frozen Potato Products

(defined below) in the United States.  Plaintiff makes the following allegations based upon personal knowledge as to herself, and upon information and belief and investigation of counsel as to all others.

## INTRODUCTION

1.     Processor Defendants Cavendish, Simplot, Lamb Weston, and McCain Foods are the dominant processors and sellers of frozen french fries, hash browns, tater tots and other frozen potato products (collectively, "Frozen Potatoes" or "Frozen Potato Products") in the United States. Processor Defendants collectively control approximately 98% of the Frozen Potato Product market in North America.

2.     Starting as early as January 1, 2021 and continuing to the present (the "Class Period"), Defendants and their co-conspirators conspired to fix, raise, maintain, and stabilize prices of Frozen Potato Products sold in the United States above competitive levels. Defendants executed their conspiracy, which is continuing in nature, through lockstep price increases. Between July 2022 and July 2024, Frozen Potato Product prices soared 47% even while Processor Defendants' input costs declined.

3.     While the Frozen Potato Product market did face a temporary increase in input costs, Processor Defendants' conspiracy enabled them to fix, raise, maintain, and stabilize Frozen Potato Product prices even after those costs declined significantly, enabling them to realize unprecedented margins and profits.  Processor Defendants' price-fixing conspiracy also enabled them to artificially inflate prices without fear that their competitors would undercut their prices and take their market share.

4.     In 2023, the former VP of International at Lamb Weston acknowledged that Processor Defendants Lamb Weston, Simplot, and McCain "have never ever seen margins this high in the history of the potato industry." He explained that Processor Defendants realized this success because they "absolutely" had "no incentive to fight that hard for each other's share" and instead were

all "behaving themselves" to maintain high margins. Lamb Weston thereafter reported that its first quarter fiscal year 2024 net income increased a staggering 111% year-over-year.

5.      Similarly, Simplot's Director of Sales explained that, although customers threatened to switch to one of its competitors following Simplot's price increase, "we knew we weren't worried about it."

6.      In 2024, a former Senior Director for McCain commented that McCain was unwilling to compete with Lamb Weston on the price of certain Frozen Potato Products. While he originally thought McCain should compete and pursue additional market share, "the higher ups in the room" advised not to do so.

7.      The Frozen Potato Product market has characteristics that make it more susceptible to collision and enable Defendants to implement their price-fixing conspiracy. For example, the Frozen Potato Product market is highly concentrated among a few processors who have numerous opportunities to collude. The Frozen Potato Product market also has high barriers to entry, fragmented buyers, and inelastic demand. Moreover, Defendants Circana and NPPB facilitated the conspiracy by providing mechanisms for Processor Defendants to exchange competitively sensitive information and monitor their conspiracy.

8.      Defendants' unlawful anticompetitive actions had the intended purpose and effect of artificially fixing, raising, maintaining, and stabilizing the price of Frozen Potato Products. Among the victims of the conspiracy are U.S. consumers of Frozen Potato Products, such as Plaintiff and members of the Class (defined below). In absence of Defendants' conspiracy, Plaintiff and members of the Class would have paid less for Frozen Potato Products than they did during the Class Period.

9.      Plaintiff brings this proposed class action on behalf of consumers for redress of the injury and damages she and members of the Class have suffered and continue to suffer by reason of Defendants' continuing violations of law and to restore competition in the Frozen Potato Product

3

market.

## JURISDICTION AND VENUE

10.     This action arises under Section 1 of the Sherman Act (15 U.S.C. § 1), and Section 16 of the Clayton Act (15 U.S.C. § 26). Plaintiff's Sherman Act claim seeks injunctive relief, costs of suit, and reasonable attorney's fees, and Plaintiff's state law claims seek injunctive relief, damages, costs of suit, and reasonable attorneys' fees.

11.     This Court has subject matter jurisdiction pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26, and 28 U.S.C. §§ 1331, 1333(d), 1337(a), and 1367.

12.     This Court has personal jurisdiction over all Defendants pursuant to Section 12 of the Clayton Act, 15. U.S.C. § 22 and 28 U.S.C. § 1391. Venue is proper because Defendants reside, transact business, and can be found in this District.

13.     Defendants' unlawful, anticompetitive conduct substantially affected interstate commerce throughout the United States, causing injury to Plaintiff and the geographically dispersed members of the Class.

14.     Venue is appropriate in this District under Sections 4, 12, and 16 of the Clayton Act, 15 U.S.C. §§ 15, 22 and 26 and 28 U.S.C. § 1391(b), (c) and (d), because one or more Defendants resided or transacted business in this District, is licensed to do business or is doing business in this District, and because a substantial portion of the affected interstate commerce described herein was carried out in this District.

15.     This Court has personal jurisdiction over each Defendant because, *inter alia*, each Defendant: (a) transacted business throughout the United States, including in this District; (b) manufactured, sold, shipped, and/or delivered substantial quantities of Frozen Potato Products throughout the United States, including in this District; (c) had substantial contacts with the United States, including this District; and/or (d) engaged in an antitrust conspiracy that was directed at and

4

had a direct, foreseeable, and intended effect of causing injury to the business or property of persons residing in, located in, or doing business throughout the United States, including this District.

16. The activities of the Defendants and all co-conspirators, as described herein, were within the flow of, were intended to, and did have direct, substantial and reasonably foreseeable effects on the interstate commerce of the United States.

17. No other forum would be more convenient for the parties and witnesses to litigate this case.

**PARTIES**

**PLAINTIFF**

18. Plaintiff Dolores Cardoso is an Illinois resident residing in Cook County, Illinois. Plaintiff indirectly purchased Frozen Potato Products from one or more of the Processor Defendants during the Class Period for her own personal use and not for resale. Plaintiff was injured in her business or property as a direct, proximate, and material result of Defendants' violations of law alleged in this Complaint. Plaintiff is threatened with future injury to her business or property by reason of Defendants' continuing violations of law, absent Court intervention.

**DEFENDANTS**

**A.     Cavendish Farms**

19. Defendant Cavendish Farms, Inc. is a Delaware corporation that maintains its primary United States office at 25 Burlington Mall Road, Burlington, Massachusetts, and a manufacturing plant at 5855 Third Street, S.E. Jamestown, North Dakota. Cavendish Farms, Inc. is a wholly owned subsidiary of Defendant Cavendish Farms, Ltd., a company existing under the laws of the Province of New Brunswick, Canada with its principal place of business located at 100 Midland Dr. Dieppe, New Brunswick, Canada E1A 6X4.

20. Cavendish manufactures frozen french fries and potato products at facilities

throughout the United States and is the fourth largest processor of Frozen Potato Products in North America. At all times relevant to this action, Cavendish was doing business in the State of Illinois.

**B.     J.R. Simplot Company**

21.     Defendant J.R. Simplot Company ("Simplot") is a Nevada corporation with its principal place of business located at 1099 West Front Street, Boise, Idaho.

22.     Simplot manufactures Frozen Potato Products at facilities throughout the United States.

23.     Simplot is one of the largest potato companies in the world, with gross revenue in 2020 exceeding $6 billion. At all times relevant to this action, Simplot was doing business in the State of Illinois.

**C.     Lamb Weston**

24.     Defendant Lamb Weston Holdings, Inc. is a Delaware corporation with its principal place of business located at 599 South Rivershore Lane, Eagle, Idaho. It owns and operates a collection of subsidiaries all involved in the production and marketing of Frozen Potato Products, including Defendants Lamb Weston, Inc., Lamb Weston BSW, LLC, Lamb Weston/Midwest, Inc. and Lamb Weston Sales, Inc.

25.     Lamb Weston Holdings, Inc. is a publicly traded company on the New York Stock Exchange. Lamb Weston is the world's second largest producer of branded and private-label Frozen Potato Products, including french fries, tater tots and hash browns.

26.     At all times relevant to this action, Lamb Weston was doing business in the State of Illinois.

**D.     McCain Foods**

27.     Defendant McCain Foods USA, Inc. is a Maine corporation with its principal place of business located at One Tower Lane, 11th Floor, Oakbrook Terrace, Illinois. Defendant McCain

Foods USA, Inc. is a wholly owned subsidiary of Defendant McCain Foods Limited, a company existing under the laws of the Province of New Brunswick, Canada, with its principal place of business located at 439 King Street West, 5th Floor, Toronto, Ontario, Canada.

28.     McCain's products are manufactured throughout the United States at several food processing facilities. McCain is one of the world's largest manufacturers of Frozen Potato Products. McCain sells its products at retail and to food-service companies. McCain has significant operations in the United States, and at all times relevant to this action, McCain was doing business in the State of Illinois.

**E.     Circana, LLC**

29.     Defendant Circana, LLC ("Circana") is a Delaware limited liability company with its principal place of business in Chicago, Illinois.

30.     Circana was created following an August 2022 merger of data analytics firms Information Resources, Inc. and The NPD Group. Circana "is the leading advisor on the complexity of consumer behavior. Through unparalleled technology, advanced analytics, cross-industry data and a deep expertise, Circana provides clarity that helps clients take action and unlock business growth."

31.     PotatoTrac is designed, maintained and/or otherwise affiliated with Circana and Circana's predecessor, The NPD Group. PotatoTrac enabled competitors in the Frozen Potato Product market, including Processor Defendants, to directly exchange data to control supply, costs and downstream pricing through the collection and standardization of their data to monitor or discipline co-conspirators. PotatoTrac's detailed reports provide competitors with a view of the entire market, removing questions of competition on price. PotatoTrac allows processors to understand the market using graphs and other helpful graphics that highlight price directions.

**F.     National Potato Promotion Board**

32.     Defendant National Potato Promotion Board d/b/a Potatoes USA ("NPPB") is a

business entity with its principal place of business located in at 3675 Wynkoop Street, Denver, Colorado.

33.     NPPB is a trade association that includes as its members Processor Defendants. NPPB's members also include other potato growers and importers.

34.     NPPB describes itself as "the only national marketing and research organization focused solely on strengthening the demand for American's Favorite Vegetable." Its stated mission is to "coordinate regional, national, and even international research efforts to collect potato-related data on all fronts" with a goal to "grow our entire industry beyond our wildest imaginations."

35.     NPPB explains that "[w]e analyze potato volumetric data to help our grower partners understand demand. We facilitate production trials to unearth new potato varieties and market potential."

36.     NPPB uses Defendant Circana's data to disseminate information, including in regular press releases, that influences the potato industry to take certain actions, such as adjusting prices. NPPB does so by combining Circana retailer pricing data with press releases to show general directions for sales.  NPPB's press releases and access to Circana's data help Processor Defendants know how to adjust their prices of Frozen Potato Products.

## AGENTS AND CO-CONSPIRATORS

37.     Various other persons, firms and corporations not named as defendants have participated as co-conspirators with Defendants and have performed acts and made statements in furtherance of the conspiracy. Defendants are jointly and severally liable for the acts of their co-conspirators, whether or not the co-conspirators are named as defendants in this Complaint.

38.     Whenever reference is made to any act of any corporation, the allegation means that the corporation engaged in the act by or through its officers, directors, agents, employees or representatives while they were actively engaged in the management, direction, control or transaction

of the corporation's business or affair.

39.     Each Defendant acted as the principal or agent of, or for, other Defendants with respect to the acts, violations, and common course of conduct alleged herein.

40.     Defendants are also liable for acts done in furtherance of the alleged conspiracy by companies they acquired through mergers and acquisitions.

## FACTUAL ALLEGATIONS

### A.     Background of the Frozen Potato Product Market

41.     Potatoes are the top vegetable crop in the United States. Billions of pounds of potatoes are harvested, processed and consumed in the United States annually.

42.     Approximately 70% of potatoes sold in the United States are sold to processors for Frozen Potato Products, chips, shoestrings, dehydrated potatoes, and other potato products. Of those potatoes sold to processors, approximately 60% are used for Frozen Potato Products.

43.     Frozen Potato Product processors typically acquire potatoes in mass quantities from potato growers and produce a variety of products in their factories.  Frozen Potato Products are produced though a multi-step process that is highly automated using specialized machines. These machines clean and peel potatoes, cut them into shapes, and blanch, dehydrate, par-fry, freeze, pack, and store them.

44.     Frozen Potato Product processors' customers include food distributors, food retailers (e.g., grocery stores), and foodservice customers (e.g., restaurants, hotels). Frozen Potato Products are ultimately intended to be sold to consumers, such as Plaintiff and members of the Class.

45.     Frozen Potato Products are ubiquitous and popular food items in the United States. Retail sales of Frozen Potato Products increased nearly 10% from 2019 to 2024.[1]  Approximately one

---

[1] T.G. Lynn, *U.S. Frozen Potato Market Thrives Amid Challenges: Opportunities for Future Growth*, POTATOES NEWS, Oct. 23, 2024, *available at* https://potatoes.news/u-s-frozen-potato-market-thrives-

third of all U.S-grown potatoes become frozen french fries. It is estimated that Americans consume a total of 4.5 billion pounds of french fries annually. In addition to fries, Frozen Potato Products include hash brown, tater tots, and potatoes that are frozen and shaped in other formats.

**B.     Defendants' Coordinated Their Pricing of Frozen Potato Products**

**1.     Frozen Potato Product Prices Rose Dramatically Due to Defendants' Conspiracy**

46.     Processor Defendants conspired to fix, raise, maintain and stabilize the price of Frozen Potato Products that they processed, distributed, sold and/or imported into the United States during the Class Period.

47.     Following years of relatively low and stable prices, Defendants' Frozen Potato Product prices increased in 2021 and skyrocketed in 2022, as the figure below demonstrates. Prices remained high through at least the end of July 2024, resulting in unparalleled margins for Defendants. As of August 1, 2024, Frozen Potato Products prices were at their highest recorded level since 1967 according to the FRED data from the Federal Reserve Bank of St. Louis.



48.     Frozen Potato Product price increases cannot be adequately explained by legitimate

amid-challenges-opportunities-for-future-growth/.

market forces, such as increased input costs.

49.     From July 2022 to July 2024, Frozen Potato Product prices increased 47%. However, during that same two-year period, Defendants' input costs *declined*. Although Defendants' input costs peaked around the third quarter of 2022, they declined substantially after that time while Defendants' Frozen Potato Product prices continued to rise.

50.     Despite a decline in input costs of about 33%, Frozen Potato Product prices remained near their peak from October 2023 through at least July 2024. This comparison indicates that Defendants collusively raised and fixed their prices including after their input costs declined.

51.     In May 2023, while Defendants' input costs were declining, stock analysts predicted that Defendant Lamb Weston's "stepped-up margin expansion" would not "be durable longer term." Contrary to that prediction, Defendants' prices continued to climb and remained at supra-competitive levels after their input costs declined.

## 2.     Defendants Imposed Lockstep Price Increases

52.     The staggering price increases for Frozen Potato Products occurred as a result of Processor Defendants' coordinated simultaneous or near-simultaneous price increases. Defendants acted in concert to fix, raise, maintain, and stabilize the price of Frozen Potato Products that they manufactured, distributed, sold, or imported into the United States.

53.     Defendants sent price increase announcements to their customers that detailed the price increase percentage, affected products, effective date, and, at times, purported justifications.

54.     Processor Defendants control approximately 98% of the Frozen Potato Product market. Acting in concert, these Defendants' significant market power affords them the ability to control the Frozen Potato Product market price.

55.     The significant Frozen Potato Product price increases would not have occurred in a competitive market that was free from Defendants' concerted action. In a truly competitive market,

if each Defendant acts individually in raising and maintaining Frozen Potato Product prices far beyond its input costs, it risks one of its competitors undercutting its prices to gain market share.

56.     Processor Defendants' significant price increases are, therefore, against their economic self-interests. However, Processor Defendants followed their collective interests through collusive price increases with the assurance that they would not undercut each other's prices or take their market share.

57.     In early 2021, Processor Defendants initiated a series of lockstep price increases multiple times a year.

58.     In January 2021, Simplot and McCain each sent price increase announcements to their customers within only one day of each other. The announcements indicated that the cost of Frozen Potato Products would increase by $0.04 per pound. Simplot also stated that the price of line flow potato products would increase by $0.02 per pound. The letters sent by Simplot and McCain both indicated an effective date of March 15, 2021.

59.     In May 2021, Lamb Weston and McCain sent price increase announcements within two weeks of each other. The Lamb Weston letter indicated that the cost of Frozen Potato Products would increase by $0.08 per pound, while the McCain price increase letter indicated that the cost of Frozen Potato Products would increase by $0.04 per pound. The letters sent by Lamb Weston and McCain had effective dates of July 1, 2021 and July 15, 2021, respectively. Furthermore, on June 4, 2021, Cavendish sent price increase letters indicating that the cost of Frozen Potato Products would increase by $0.04 per pound. The Cavendish letter had an effective date of July 15, 2021, the same day as McCain's price increase.

60.     When discussing a forthcoming Lamb Weston price increase in September 2021, Lamb Weston's former Vice President knowingly predicted that its competitor, McCain, would be pleased with the increase and would follow suit, stating: "it will probably be exactly the price increase

that McCain wanted, which was $0.04 on A grade and $0.02 they will announce a price increase."

61.     In October 2021, Lamb Weston, McCain, and Cavendish each sent price increase letters within five days of each other. The price increase letters all indicated that the cost of Frozen Potato Products would increase by $0.08 per pound, and all had the same effective date—December 15, 2021.

62.     On February 11, 2022, Lamb Weston announced that it would increase prices on "battered and coated" products by 12 cents per pound and 10 cents per pound on non-battered products effective April 2022.

63.     A mere four days later, on February 15, 2022, Simplot announced the same price increase on the same two categories of products, and McCain announced a 12 cent per pound increase on all its frozen potato products. Those price increases were also effective April 2022.

64.     One day later, on February 16, 2022, Cavendish Farms announced a price increase of 12 cents per pound for battered and coated frozen potatoes and "formed items," as well as non-battered frozen potatoes, effective April 2022.

65.     The Director of Sales at Simplot acknowledged Defendants' lockstep price increases, noting that in 2022, "that's what we did . . . . like Lamb, they did the $0.10 and $0.12 like we did in April of 2022." He noted that Simplot took a price increase in May 2022, and Lamb took a similar price increase of $.08 and $.10 in July 2022.

66.     In 2023, the Director of Sales Solutions for Simplot acknowledged that Lamb Weston took 35% in price increases and explained that Simplot, McCain, and Cavendish were also continuing to "push pricing" and "not going after new business."

67.     Defendants touted their significant margins that they could not have achieved in the absence of their conspiracy. For example, in 2023, the then-former VP of International at Lamb Weston stated that Lamb Weston, Simplot, and McCain "have never ever seen margins this high in

13

the history of the potato industry" and described the margins as "unusual." He explained that Defendants "absolutely" have "no incentive to fight that hard for each other's share"; instead, they are all "behaving themselves" in order to maintain "unheard of" high margins. He remarked that "I think we've done a pretty good job at taking margins with these price increases."

68.    Similarly, in 2024, a former Senior Director at McCain Foods' statements reflected price coordination among Defendants. He noted McCain Foods was unwilling to compete with Lamb Weston on the price of battered fries. While he originally thought McCain should compete and pursue more market share for that product, "the higher ups in the room" said not to risk it.

69.    Simplot's Director of Sales also noted that, although a couple customers threatened to switch to one of its competitors after Simplot increased its prices, "we knew we weren't worried about it."

70.    These statements reflect that Processor Defendants were confident that their co-conspirators would not undercut their prices or take their market share.

### 3.    Defendants Exchanged Competitively Sensitive Information through Defendants Circana and NPPB

71.    Processor Defendants utilized potato price data aggregation services, including Defendant Circana's "PotatoTrac" and collective action through trade associations, such as Defendant NPPB, to effectuate and monitor their conspiracy. In that regard, Circana and NPPB facilitated the conspiracy alleged herein.

72.    Each Processor Defendant participates in PotatoTrac. PotatoTrac is an industry service run through NPD Group, Inc., now known as Circana ("NPD"), a corporation that provides market information, tracking, analytic, and advisory services to its clients to help them in making better business decisions. Processor Defendants either sell or supply to NPD their company-specific ship data. PotatoTrac/NPD then sends Processor Defendants one another's market share information

14

so that they know where they and their competitors sit within the industry. On information and belief, PotatoTrac also includes company projections.

73.     The Processor Defendants readily share their proprietary commercial data and other information with NPD because they know that they are PotatoTrac's only commercial industry participants. The exchange of Processor Defendants' market share information disincentivizes them from competing on price or for market share. Instead, it enables them to maintain artificially high Frozen Potato Product prices and monitor their conspiracy.

74.     NPPB also facilitates and enables Defendants' conspiracy. NPPB disseminates joint marketing, provides export sales updates and facilitates the exchange of data between the Processor Defendants.

75.     NPPB's quarterly reports provide access to PotatoTrac data, which allows Processor Defendants to coordinate and implement their lockstep price increases described above.

C.     **The Structure and Characteristics of the Frozen Potato Product Market Render the Conspiracy Economically Plausible**

1.     **The Frozen Potato Product Market is Highly Concentrated**

76.     The Frozen Potato Product market is highly concentrated, with just a few producers controlling the vast majority of supply. Processor Defendants are the four largest domestic sellers of Frozen Potato Products in North America and collectively control approximately 98% of the market. A November 2023 analysis listed the Processor Defendants' market shares as follows: Lamb Weston at 40%; McCain at 30%; Simplot at 20%, and Cavendish at 7-8%.[2]

77.     Highly concentrated markets such as the Frozen Potato Product market are more susceptible to collusion. This is because market participants need only agree with, and monitor, a

---

[2] Morningstar, *Lamb Weston's Low-Cost Production and Solid Execution Capitalize on Continued Growth of Fries* (Nov. 20, 2023), https://www.morningstar.com/company-reports/1194572-lamb-westons-low-cost-production-and-solid-execution-capitalize-on-continued-growth-of-fries.

15

limited number of other market participants for their price-fixing agreement to be successful. Moreover, the Processor Defendants' large market shares gave them the collective power to impose and sustain the price increases described herein.

### 2. Frozen Potato Products Are Substitutable Commodity Products, Which Makes Them More Susceptible to Collusion

78. Frozen potatoes are a commodity product and Processor Defendants' Frozen Potato Products do not differ significantly in terms of quality, appearance, or use, rendering them functionally interchangeable. Frozen potatoes are generally produced and sold to standard specifications (*e.g.*, grade of potatoes, style, dimensions, color, size, free fatty acid content, weight, method of cooking, etc.) and must adhere to standards set by the U.S. Department of Agriculture for production, packing, labeling, and packaging to be competitive.

79. When products are interchangeable, companies generally are forced to win business from customers by competing on price. Thus, cartels are more likely to form between competitors selling interchangeable products as means to avoiding price-based competition and because the cartel members can more easily monitor and detect defections from a price-fixing agreement.

### 3. Demand is Inelastic in the Frozen Potato Product Market

80. Demand is considered inelastic when a seller can increase prices without suffering a substantial reduction in demand. Demand inelasticity allows for collusion, because it enables producers to raise their prices collectively without triggering substitution to alternative products that could make the conspiratorial prices unprofitable.

81. Consumer demand for Frozen Potato Products is relatively unaffected by price because Frozen Potato Products are historically considered to be an inexpensive good. Even when prices fluctuate, they comprise a small share of consumers' budgets. Moreover, as one analyst noted in 2023, "since potatoes are the most popular vegetable among U.S. consumers, the demand for

potatoes is more price inelastic than that for less popular vegetables."[3]

82.     Pricing for Frozen Potato Products is highly inelastic, in part, because there are no adequate substitutes. Frozen Potato Products are sold in virtually all restaurants and grocery stores throughout the United States. This is because, due to their reduced preparation and ease of use, Frozen Potato Products are commercially accepted on a large scale. Although there are potential substitute products, such as fresh potatoes, the characteristics of those products lack the unique characteristics of Frozen Potato Products that make them attractive to customers.

83.     Indeed, according to Defendant Lamb Weston, "[a] larger share of customers [are] adding [french fries] to meal orders than in the past." Lamb Weston's CEO, Thomas Werner, noted during a recent earnings call that: "[t]he fry attachment rate has stayed pretty consistent," though "[i]t's been above historical levels for the past two, three years," despite mounting reasons to tighten purse strings."[4]

84.     While demand for Frozen Potato Products as a category is relatively unaffected by price, competition within the industry would have allowed consumers to choose the least expensive brand.

#### 4.     Defendants Had Numerous Opportunities to Collude

85.     Defendants have had ample opportunities to collude through trade association activities, movement of executives between co-conspirators, and other contacts.

86.     Each Processor Defendant is a "sustaining member" of the National Potato Council ("NPC"). The NPC describes itself as "the advocate for the economic well-being of the U.S. potato

---

[3] Potatopro.com, *US Potato Prices Expected to Ease but Stay Elevated according to Rabobank Report* (June 6, 2023), *available at* https://www.potatopro.com/news/2023/us-potato-prices-expected-ease-stay-elevated-according-rabobank-report?amp.
[4] CNBC, *Demand for french fries reflects resilient consumer as so-called fry attachment rate holds steady* (Apr. 5, 2024) https://www.cnbc.com/2024/04/05/demand-for-french-fries-reflects-resilient-consumer-as-so-called-fry-attachment-rate-holds-steady.html.

growers on federal legislative, regulatory, environmental, and trade issues." The NPC holds annual and seasonal meetings, an annual "Potato Expo," and numerous other meetings, summits, and leadership institutes. These events provide ample opportunities for Defendants to collude. For example, Processor Defendants Simplot, Lamb Weston, and McCain sponsored the 2024 Potato Expo held in Austin, Texas.

87. Processor Defendants are also "sustaining partners" of the World Potato Congress. McCain and Simplot are "platinum" partners, while Cavendish is a "silver" partner. The Congress's vision is to be "[r]ecognized world-wide as the premier global potato networking organization," and its mission is to "create networks to help drive sustainable growth of the potato." The Congress's biennial meetings and networking events provided opportunities for collusion as well.[5]

88. Defendants McCain and Cavendish sponsored the March 2024 Northeast Potato Technology forum in Charlottetown, PEI Canada. The forum describes itself as an opportunity to "discuss potato research and promote collaboration and information exchange."

89. Defendants Simplot, McCain, and Lamb Weston sponsored the July 2024 Potato Sustainability Alliance Summer Symposium at McDonald's headquarters in Chicago, Illinois. The Potato Sustainability Alliance considers itself "an inclusive, pre-competitive collaboration of all players in the potato value chain."

**5. The Frozen Potato Product Market Has High Barriers to Entry**

90. A collusive agreement among horizontal competitors would typically attract new market entrants. However, high barriers to entry in the Frozen Potato Product industry have prevented new firms from entering the market.

91. Any new entrant in the Frozen Potato Product industry would need to invest

---

[5] https://potatocongress.org/sustaining-partners/presidents-invitation/

significant start-up capital on plants, specialized equipment, labor, infrastructure for distribution, and regulatory compliance. In addition, producers of Frozen Potato Products are typically either vertically integrated (*i.e.*, they grow their own potatoes), such as Defendant Simplot, or they have long established farm partners from whom they source their potatoes.

92.     As a result, new competitors are prevented from responding to the supra-competitive industry prices caused by Defendants' price-fixing agreement by entering the market.

## CLASS ACTION ALLEGATIONS

93.     Plaintiff brings this action on behalf of herself and as a class action under Rule 23(a), (b)(1) and (b)(2) of the Federal Rules of Civil Procedure on behalf of the members of a class of purchasers seeking injunctive relief (the "Nationwide Class") defined as follows:

> All persons and entities who indirectly purchased Frozen Potato Products from a Processor Defendant or a co-conspirator from January 1, 2021 until the time that the adverse effects of Defendants' anticompetitive conduct cease (the "Class Period").

94.     Plaintiff also brings this action on behalf of herself, and all others similarly situated as a class action under Federal Rules of Civil Procedure 23(a) and 23(b)(3), seeking damages as well as equitable relief, on behalf of the following class (the "State Law Class"):

> All persons and entities who indirectly purchased Frozen Potato Products from a Processor Defendant or a co-conspirator for personal consumption in Alabama, Arizona, Arkansas, California, Colorado, Connecticut, the District of Columbia, Florida, Hawaii, Illinois, Iowa, Kansas, Maine, Maryland, Massachusetts, Michigan, Minnesota, Mississippi, Montana, Nebraska, Nevada, New Hampshire, New Jersey, New Mexico, New York, North Carolina, North Dakota, Oregon, Rhode Island, South Dakota, Tennessee, Utah, Vermont, West Virginia, and/or Wisconsin during the Class Period.

95.     Specifically excluded from the Nationwide Class and State Law Class (collectively, the "Class") are Defendants; the officers, directors, or employees of any Defendant; any entity in which any Defendant has a controlling interest; and any affiliate, legal representative, heir, or assign

of any Defendant. Also excluded from the Class is any judicial officer presiding over this action and the members of his/her immediate family and judicial staff, any juror assigned to this action, any business majority-owned by any such person, and any co-conspirator identified in this action.

96.     **Numerosity**: Plaintiff does not know the exact number of Class members because such information presently is in the exclusive control of Defendants or others. Plaintiff believes that due to the nature of the trade and commerce involved, there are thousands of Class members geographically dispersed throughout the United States, such that joinder of all Class members is impracticable.

97.     **Typicality**: Plaintiff's claims are typical of the claims of the Class because Plaintiff purchased Frozen Potato Products indirectly from one or more of the Defendants, and therefore Plaintiff's claims arise from the same common course of conduct giving rise to the claims of the members of the Class and the relief sought is common to the Class.

98.     **Common Questions Predominate**: There are questions of law and fact common to the Class, including, but not limited to:

A.     Whether Defendants and their co-conspirators engaged in an agreement, combination, or conspiracy to fix, raise, maintain, or stabilize prices of Frozen Potato Products sold in interstate commerce in the United States;

B.     The duration of the conspiracy alleged herein and the acts performed by Defendants and their co-conspirators in furtherance of the conspiracy;

C.     Whether the alleged conspiracy violated the antitrust laws;

D.     Whether the conduct of Defendants and their co-conspirators, as alleged in this Complaint, caused injury to the business or property of the Plaintiff and Class members;

E.     The effect of Defendants' alleged conspiracy on the prices of Frozen Potato Products sold in the United States and applicable states listed in the State Law Class during the Class Period;

F.     Whether Plaintiff and other members of the Class are entitled to, among other things, injunctive relief and if so, the nature and extent of such injunctive relief; and

G.     The appropriate class-wide measure of damages.

These and other questions of law or fact which are common to the members of the Class predominate over any questions affecting only individual members of the Class.

99.     **Adequacy**: Plaintiff will fairly and adequately protect the interests of the Class in that Plaintiff's interests are aligned with, and not antagonistic to, those of the other members of the Class who indirectly purchased Frozen Potato Products and Plaintiff has retained counsel competent and experienced in the prosecution of class actions and antitrust litigation to represent herself and the Class.

100.     **Superiority**: A class action is superior to other available methods for the fair and efficient adjudication of this controversy since individual joinder of all damaged Class members is impractical. Prosecution as a class action will eliminate the possibility of duplicative litigation. The relatively small damages suffered by individual Class members compared to the expense and burden of individual prosecution of the claims asserted in this litigation means that, absent a class action, it would not be feasible for Class members to seek redress for the violations of law herein alleged. Further, individual litigation presents the potential for inconsistent or contradictory judgments and would greatly magnify the delay and expense to all parties and to the court system. Therefore, a class action presents far fewer case management difficulties and will provide the benefits of unitary adjudication, economy of scale and comprehensive supervision by a single court.

101.     The prosecution of separate actions by individual Class members would create the risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendants.

102.     Defendants have acted on grounds generally applicable to the Class, thereby making

final injunctive relief appropriate with respect to the Class as a whole.

## DEFENDANTS ARE ENGAGING IN A CONTINUING ANTITRUST VIOLATION

103.    During the Class Period, Defendants continued to sell Frozen Potato Products to Plaintiff and other putative Class Members at prices artificially inflated by Defendants' price-fixing conspiracy.

104.    Due to ever-fluctuating economic and market conditions, Defendants needed to continually renew, monitor, and adjust their price-fixing agreement. This resulted in multiple coordinated price increases throughout the Class Period, as described above. Moreover, each of these activities resulted in new, overt acts that injured Plaintiff and members of the Class, thus creating a new cause of action for purposes of the statute of limitations.

105.    Each sale of Frozen Potato Products made to Plaintiff or the members of the Class that was artificially inflated as a result of the conspiracy also constituted a new, overt act that restarted the statute of limitations.

106.    These new, overt acts—which would not have occurred had the conspiracy disbanded—were not merely reaffirmations of Defendants' previous acts. Rather, they were new and independent acts that were necessary to renew and refine Defendants' agreement, resulting in new and accumulating injury to Plaintiff and the other members of the proposed Class.

107.    As a result, Defendants engaged in a continuing antitrust violation throughout the Class Period and, regardless of any tolling and estoppel-related arguments, Plaintiff's claims and those of the Class are not time barred.

## PLAINTIFF DID NOT DISCOVER, NOR COULD HAVE DISCOVERED THROUGH REASONABLE DILIGENCE THE CLAIMS IN THIS LAWSUIT EARLIER

108.    Plaintiff's antitrust claims are governed by the discovery rule—*i.e.*, the statute of limitations does not begin to run until discovery of the injury from the alleged violation. Prior to the

investigation and analysis performed by and for Plaintiff's counsel, Plaintiff and putative Class Members did not know, nor could they have known through the exercise of reasonable diligence, that the prices they were paying for Frozen Potatoes were artificially inflated and causing them injury.

109.    Furthermore, even assuming that Plaintiff could have somehow discovered their injury sooner (which they could not have), they could not have determined that those injuries were the result of Defendants' price-fixing conspiracy. Not only did Defendants never reveal the existence of their price-fixing conspiracy, they actively concealed its existence by, among other things, blaming price increases on non-conspiratorial factors. Plaintiff did not know and had no reasonable way of knowing that these statements were false and, in fact, that she was being injured by Defendants' price-fixing conspiracy.

110.    For these reasons, both the discovery rule and the doctrine of equitable tolling dictate that all of Plaintiff's claims and those of the putative Class, going back to the beginning of the Class period, are timely.

## DEFENDANTS FRAUDULENTLY CONCEALED THEIR CONSPIRACY

111.    Throughout the Class Period, each of the Defendants effectively, affirmatively, and fraudulently concealed their conspiracy from Plaintiff and members of the Class.

112.    In engaging in the price increases and other conspiratorial acts set forth in this Complaint, the Defendants pointed to and utilized false and misleading pretexts, including assertions that the price increases were due to rising costs of potatoes and other inputs for Frozen Potato Products. As set forth herein, and based on Plaintiff's analysis, such pretexts cannot explain or justify the prices increases set forth herein and were intended to conceal Defendants' conspiracy.

113.    As a result of this active concealment, Plaintiff and members of the Class neither knew, nor in the exercise of due diligence could they have reasonably known, of the facts that form the basis for their claims. Thus, even if the discovery rule or equitable tolling were somehow

inapplicable, Defendants should nonetheless be estopped from raising any statute of limitations defense.

## THE CAPPER-VOLSTEAD IMMUNITY DOES NOT APPLY

114.    The Capper-Volstead Act, passed in 1922 as the Co-operative Marketing Associations Act (P.L. 67-146), grants certain agricultural producers and exemption under the antitrust laws when these producers are acting "in collectively processing, preparing for market, handling, and marketing in interstate and foreign commerce" their agricultural products. 7 U.S.C. § 291. These agricultural cooperative "associations and their members may make the necessary contracts and agreements to effect such purposes."

115.    The Capper-Volstead Act allows these producers, as part of the cooperative association, to agree on prices and terms of sale, engage in joint marketing activity, agree on common marketing practices with other cooperatives, engage in other combined activities to promote market efficiency, which, absent the Act, would run afoul of the Sherman Act.

116.    Immunity under the Capper-Volstead Act is not absolute; it extends only to organizations or cooperatives whose membership consists exclusively of producers of agricultural products, and which are involved in processing, preparing for market, handling or marketing the agricultural products of its members.

117.    The Capper-Volstead Act requires that cooperatives operate for the mutual benefit of their members. The Act limits the immunity it provides to those cooperatives that grant equal voting rights to all members. Specifically, no member can have more than one vote, regardless of the amount of stock or membership capital they hold. The limited protections of the Capper-Volstead Act are inapplicable if the cooperative is not exclusively composed of producers. If even one member of the cooperative is not a producer, the protections of the Capper-Volstead Act will not apply. Additionally, even if an individual producer qualifies as a Capper-Volstead entity, it will lose this

24

immunity if it conspires with an entity that does not qualify under the Capper-Volstead Act.

118.    Capper-Volstead does not apply here. Defendants' activities are characterized as anticompetitive and predatory. Defendants' actions do not foster market efficiency and lack any legitimate business justification. The primary aim of the conspiracy is to artificially raise the sales price of Frozen Potato Products in the United States, which Defendants in this matter have done.

## ANTICOMPETITIVE EFFECTS OF DEFENDANTS' CONDUCT

119.    Defendants' anticompetitive conduct had the following effects, among others:

a.    Price competition has been restrained or eliminated with respect to Frozen Potato Products;

b.    The prices of Frozen Potato Products have been fixed, raised, stabilized, or maintained at artificially inflated levels;

c.    Indirect purchasers of Frozen Potato Products have been deprived of free and open competition; and

d.    Indirect purchasers of Frozen Potato Products paid artificially inflated prices.

120.    The purpose of the conspiratorial conduct of the Defendants and their co-conspirators was to fix, raise, maintain or stabilize the price of Frozen Potato Products. As a direct and foreseeable result of Defendants' conduct, Plaintiff and the Class paid supra-competitive prices for Frozen Potato Products during the Class Period.

121.    By reason of the violations of the antitrust laws alleged herein, Plaintiff and members of the Class have sustained injury to their businesses or property, having paid higher prices for Frozen Potato Products than they would have paid in the absence of Defendants' illegal contract, combination, or conspiracy. As a result, they have suffered damages.

122.    This is an antitrust injury of the type that the antitrust laws were designed to prevent, and this injury flows from that which makes Defendants' conduct unlawful.

## CLAIMS FOR RELIEF

### COUNT I: PRICE FIXING

**Section 16 of Clayton Act (15 U.S.C. § 26) for Violation of
Section 1 of the Sherman Act (15 U.S.C. § 1)
(On Behalf of Plaintiff and the Nationwide Class for
Injunctive and Equitable Relief)**

123.    Plaintiff hereby repeats and incorporates by reference each preceding paragraph as though fully set forth herein.

124.    Processor Defendants are direct competitors in the Frozen Potato Product market throughout the United States.

125.    Defendants and their co-conspirators formed an unlawful contract, combination, or conspiracy in unreasonable restraint of trade in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, to raise, fix, maintain, or stabilize Frozen Potato Product prices.

126.    Beginning as early as 2021, the exact date being unknown to Plaintiff and exclusively within the knowledge of Defendants, and continuing through the present, Defendants and their co-conspirators agreed with each other to exchange competitively sensitive non-public information to raise, fix, maintain, or stabilize the prices of Frozen Potato Products at artificially high, non-competitive levels. The agreement was intended to and did unreasonably restrain trade and suppress competition. It has the purpose and effect of raising, fixing, maintaining, or stabilizing for Frozen Potato Products at artificially high, non-competitive levels throughout the United States.

127.    Pursuant to the agreement, Defendants agreed to and did share pricing and other information that distorted and suppressed competition in the relevant market knowing and intending that the information would be used to raise, fix, maintain, or stabilize prices of Frozen Potato Products sold to Plaintiff and members of the Class at artificially high, non-competitive levels. Defendants' acts in furtherance of their combination or conspiracy were authorized, ordered, or done by their

26

officers, agents, employees, or representatives while actively engaged in the management of Defendants' affairs.

128.    Defendants' anticompetitive acts had a direct, substantial, and foreseeable effect on interstate commerce by raising and fixing prices for Frozen Potato Products throughout the United States.

129.    As a result of Defendants' unlawful conduct, Plaintiff and members of the Nationwide Class have been harmed by being forced to pay inflated, supra-competitive prices for Frozen Potato Products.

130.    As a direct and proximate result of Defendants' anticompetitive conduct, Plaintiff and members of the Nationwide Class have been injured in their business or property by paying more for Frozen Potato Products than they would have paid in the absence of the conspiracy.

131.    Plaintiff and the Nationwide Class are threatened with future injury to their business and property by reason of Defendants' continuing violation of Section 1 of the Sherman Act, within the meaning of Section 16 of the Clayton Antitrust Act, 15 U.S.C. § 26.

132.    Plaintiff and the Nationwide Class are entitled to an injunction against Defendants, preventing and restraining the violations alleged herein.

133.    Defendants' alleged contract, combination, or conspiracy is a *per se* violation of the federal antitrust laws.

## COUNT II: UNLAWFUL INFORMATION EXCHANGE

### Section 16 of Clayton Act (15 U.S.C. § 26) for Violation of
### Section 1 of the Sherman Act (15 U.S.C. § 1)
### (On Behalf of Plaintiff and the Nationwide Class for Injunctive and Equitable Relief)

134.    Plaintiff hereby repeats and incorporates by reference each preceding paragraph as though fully set forth herein.

135.    For purposes of this Count, which is based upon a claim subject to a Rule of Reason

27

analysis, the relevant geographic market is the United States, and the relevant product market is the Frozen Potato Product market. As noted above, the Processor Defendants now control approximately 98% of this market and thus possess market power within it.

136.    Beginning at a time currently unknown to Plaintiff, but at least as early as January 1, 2021, and continuing through the present, Defendants agreed with each other to exchange competitively sensitive, non-public information to raise, fix, maintain, or stabilize prices for Frozen Potato Products in the United States to or at supra-competitive levels. The agreement was intended to and did unreasonably restrain trade and suppress competition, and it had the likely and actual effect of raising, fixing, maintaining, or stabilizing prices in the Frozen Potato Product market in the United States to or at supra-competitive levels, in violation of Section 1 of the Sherman Act (15 U.S.C. § 1).

137.    Pursuant to the agreement, Defendants agreed to and did share pricing and other internal, material competitive information that distorted and suppressed competition in the relevant market while knowing and intending that the information would be used to raise, fix, maintain, or stabilize prices of Frozen Potato Products sold in the United States to Plaintiff and Class Members to or at supra-competitive levels.

138.    This conduct is unlawful under either a quick look or a full-fledged Rule of Reason analysis because the agreement is facially anticompetitive with no valid procompetitive justification. Moreover, even if there were valid procompetitive justifications, Defendants' objectives could have been reasonably achieved through less restrictive means.

139.    The contract, combination, or conspiracy alleged herein has had the following effects, among others:

      a.   Price competition in the sale of Frozen Potato Products has been restrained, suppressed, and/or eliminated in the United States;

      b.   Prices for Frozen Potato Products sold by the Processor Defendants have been

raised, fixed, maintained, or stabilized at artificially high, non- competitive levels throughout the United States; and

c.  Plaintiff and the Nationwide Class have been deprived of the benefits of free and open competition.

140.    Plaintiff and Nationwide Class members have been injured and will continue to be injured in their businesses or property by paying more for Frozen Potato Products purchased indirectly from the Processor Defendants or their co-conspirators than they would have paid and will pay in the absence of the contract, combination, or conspiracy.

141.    Plaintiff and the Nationwide Class are threatened with future injury to their business and property by reason of Defendants' continuing violation of Section 1 of the Sherman Act, within the meaning of Section 16 of the Clayton Antitrust Act, 15 U.S.C. § 26.

142.    Plaintiff and the Nationwide Class are entitled to an injunction against Defendants, preventing and restraining the violations alleged herein.

## COUNT III: STATE ANTITRUST LAWS

143.    Plaintiff hereby repeats and incorporates by reference each preceding paragraph as though fully set forth herein.

144.    By reason of the foregoing, Defendants have violated, and Plaintiff and members of the Class are entitled to relief under:

a.  Alabama, Ala. Code. § 6-5-60, *et seq*.

b.  Arizona, Ariz. Rev. Stat. § 44-1401, *et seq*.

c.  Arkansas, Ark. Code. Ann. § 4-75-211, *et seq*.

d.  California, Cal. Bus. & Prof. Code § 16700, *et seq*.

e.  Colorado, Colo. Rev. Stat. §6-4-101, *et seq*.

f.  Connecticut, Conn. Gen. Stat. § 35-24, *et seq*.

g.  District of Columbia, D.C. Code § 28-4501, *et seq.*

h.  Hawaii, Hawaii Rev. Stat. § 480-1, *et seq.*

i.  Illinois, Illinois Comp. Statutes § 740, Ill. Comp. Stat. 1011, *et seq.*

j.  Iowa, Iowa Code § 553.1, *et seq.*

k.  Kansas, Kan. Stat. Ann. § 50-101, *et seq.*

l.  Maine, Maine Rev. Stat. tit. 10, § 1101, *et seq.*

m.  Maryland, Md. Code, Comm. Law § 11-201, *et seq.*

n.  Michigan, MCL § 445.773, *et seq.*

o.  Minnesota, Minn. Stat. § 325D.49, *et seq.*

p.  Mississippi, Miss. Code Ann. § 75-21-1, *et seq.*

q.  Nebraska, Neb. Rev. Stat. § 59-801, *et seq.*

r.  Nevada, Nev. Rev. Stat. § 598A.010, *et seq.*

s.  New Jersey, N.J. Stat. Ann. § 56:9-1, *et seq.*

t.  New Mexico, N.M. Stat. Ann. § 57-1-1, *et seq.*

u.  New York, N.Y. Gen. Bus. Law § 340, *et seq.*

v.  North Carolina, N.C. Gen. Stat. § 75-1, *et seq.*

w.  North Dakota, N.D. Cen. Code § 51-08.1-01, *et seq.*

x.  Oregon, Or. Rev. Stat. § 646.705, *et seq.*

y.  Rhode Island, R.I. Sat. § 6-36-1, *et seq.*

z.  South Dakota, S.D. Cod. Laws § 37-1-3.1, *et seq.*

aa.  Tennessee, Tenn. Code Ann. § 47-25-101, *et seq.*

bb.  Utah, Utah Code. Ann. § 76-10-3101, *et seq.*

cc.  Vermont, Vermont Stat. Ann. tit. 9, § 2451, *et seq.*

dd.  West Virginia, W.V. Code § 47-18-1, *et seq.*

ee. Wisconsin, Wisc. Stat. § 133.01, *et seq*.

## COUNT IV: STATE CONSUMER PROTECTION LAWS

145. Plaintiff hereby repeats and incorporates by reference each preceding paragraph as though fully set forth herein.

146. By reason of the foregoing, Defendants have violated, and Plaintiff and members of the Class are entitled to relief under:

  a. Arizona, Ariz. Rev. Stat. §§ 44-1521, *et seq*.

  b. Arkansas, Ark. Code §§ 4-88-101, *et seq*.

  c. California, California Bus & Prof. Code §§ 17200, *et seq*.

  d. Colorado, Colo. Rev. Stat. §6-1-101, *et seq.*

  e. Connecticut, Conn. Gen. Stat. § 42-110, *et seq*.

  f. District of Columbia, D.C. Code Ann. §28-3901, *et seq*.

  g. Florida, Fla. Stat. § 501.201, *et seq*.

  h. Hawaii, Hawaii Rev. Stat. § 480-2, *et seq*.

  i. Kansas, Kan. Stat. Ann. § 50-623, *et seq*.

  j. Massachusetts, Mass. Gen. Laws, chapter 93A § 1, *et seq*.

  k. Michigan, Mich. Comp. Laws § 445.901, *et seq*.

  l. Minnesota, Minn. Stat. § 325F.69, *et seq*.

  m. Mississippi, Miss. Code § 75-24-1, *et seq*.

  n. Montana, Mont. Code Ann. §§ 59-801 *et seq.*

  o. Nebraska, Neb. Rev. Stat. §§ 59-1601, *et seq*.

  p. Nevada, Nev. Rev. Stat. §§ 598.0903, *et seq*.

  q. New Hampshire, N.H. Rev. Stat. §§ 358-A:1, *et seq*.

  r. New Jersey, N.J. Stat. § 56-8-1, *et seq*.

    s.   New Mexico, N.M. Stat. Ann. §§ 57-12-1, *et seq*.

    t.   New York, N.Y. Gen. Bus. Law § 349, *et seq*.

    u.   North Carolina, N.C. Gen. Stat. §§ 75-1.1, *et seq*.

    v.   Rhode Island, R.I. Gen. Laws §§ 6-13.1-1, *et seq*.

### COUNT V: UNJUST ENRICHMENT

147.    Plaintiff hereby repeats and incorporates by reference each preceding paragraph as though fully set forth herein.

148.    Defendants financially benefited from their unlawful acts at the expense of Plaintiff and members of the Class, who paid supra-competitive prices for Frozen Potato Products during the Class Period.

149.    It is unjust and inequitable for Defendants to have enriched themselves in this manner at the expense of Plaintiff and members of the Class, and the circumstances are such that equity and good conscience require Defendants to make restitution to Plaintiff and members of the Class.

150.    Defendants should be made to disgorge their ill-gotten gains to a constructive trust created for the benefit of Plaintiff and members of the Class, from which Plaintiff and members of the Class may obtain restitution.

151.    By reason of the foregoing, Plaintiff and members of the Class are entitled to relief under the laws of all states and the District of Columbia, other than Indiana and Ohio.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on behalf of herself and members of the Class, respectfully prays that This Honorable Court:

A.    Order that this action may be maintained as a class action under Rule 23(a) and (b) of the Federal Rules of Civil Procedure, appoint Plaintiff as the Class Representative and her

counsel of record as Class Counsel, and that reasonable notice of this action, as provided by Rule 23(c)(2), be given to members of the Class;

B.     Adjudge and decree that the unlawful conduct, conspiracy or combination alleged herein is a *per se* violation of Section 1 of the Sherman Act, and a violation of each of the state law statutes alleged herein;

C.     Award Plaintiff and the relevant Class Members compensatory damages under the state statutes in an amount to be proven at trial, multiple damages according to law against Defendants, jointly and severally;

D.     Award Plaintiff and members of the Class actual, treble, punitive, and exemplary damages; attorneys' fees and costs of suit, including costs of consulting and testifying experts; and pre- and post-judgment interest;

E.     Order Defendants to disgorge their profits earned as a result of their wrongful conduct and order them to make restitution to Plaintiff and Class Members;

F.     Grant prospective injunctive relief, including structural relief, to prevent and restrain any future violations of law;

G.     Award Plaintiff and the Class members recover their costs of suit, including reasonable attorneys' fees, as provided by law; and

H.     Grant Plaintiff and the Class members such other and further relief as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff demands a trial by jury, pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, of all issues so triable.


Dated: January 10, 2025

By: /s/*Rachel Dapeer*
Rachel Dapeer
**DAPEER LAW, P.A.**
20900 NE 30th Avenue, #417
Aventura, FL 33180
Tel: (954) 799-5914
rachel@dapeer.com

Michelle C. Clerkin (*pro hac vice* forthcoming)
**SPIRO HARRISON & NELSON**
1111 Lincoln Road, Suite 500
Miami Beach, FL 33139
Tel: (786) 841-1181
mclerkin@shnlegal.com

Jason C. Spiro (*pro hac vice* forthcoming)
David B. Harrison (*pro hac vice* forthcoming)
**SPIRO HARRISON & NELSON**
40 Exchange Place, Suite 1100
New York, NY 10005
Tel.: (646) 880-8850
jspiro@shnlegal.com
dharrison@shnlegal.com

***Counsel for Plaintiff and the Proposed Class***